UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Huang Zhuang,

     Petitioner,

vs.         REPORT AND RECOMMENDATION

United States Citizenship and
Immigration Services,

       Respondent.  Civ. No. 03-6527 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the parties' cross Motions for Summary Judgment.[1] For

---

[1]Although the Respondent's Motion bears the caption "Motion To Dismiss," the memorandum in support of that Motion, Docket No. 14, reveals that the Respondent is seeking "Dismissal/Summary Judgment." Moreover, all of the submissions on the Record clearly reflect that both parties expect this case to be resolved by Summary Judgment.

In truth, in this context, Summary Judgment is something of a misnomer, because the Court, in reviewing the decision of the Immigration officials to deny

(continued...)

these purposes, the Petitioner appears by Michael J. Ford, Susan M. Roberts, and Heidi N. Thoennes, Esqs., and the Respondent appears by Mary Jo Madigan, Assistant United States Attorney.   For reasons which follow, we recommend that the Petitioner's Motion be denied, the Respondent's Motion be granted, and that Judgment be entered in favor of the Respondent.

## II.  Factual and Procedural History[2]

The Petitioner commenced this action by filing a pleading entitled "Petition For De Novo Review Of Naturalization Application Pursuant To 8 C.F.R. 336.9."  Docket No. 1.   The Respondent United States Citizenship and Immigration Services

---

[1](...continued)
naturalization, is obligated to make findings of fact, and conclusions of law.  See Title 8 U.S.C. §1421(c)("Such [judicial] review shall be de novo, and the court shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application.").  Plainly, "findings of fact" are not the grist of Summary Judgment.  For convenience, however, we continue to use the parties' designation of their respective Motions, and style the Motions as ones for Summary Judgment, even though our review has been de novo, and this Report contains our findings of fact and conclusions of law.

[2]Our understanding of the factual and procedural history of this matter is based entirely upon the Administrative Record that has been proffered by the Respondent. Docket No. 15.  We cite to that Record as "R. ___."  As a result, this section of our Report contains our findings of fact, and is augmented by subsequent sections which detail our conclusions of law, and our mixed determinations of fact and law.

("USCIS")[3] previously denied the Petitioner's Application for Naturalization, and the Petitioner now seeks <u>de</u> <u>novo</u> review of that decision pursuant to Title 8 U.S.C. §1421(c).

The Petitioner was born in China, and is a citizen of that country.  He first came to the United States in 1988, and he was granted permanent resident alien status in 1995.  After the Petitioner arrived in the United States, he found work as a cook and a restaurant manager.  He later opened his own restaurant in Little Falls, Minnesota. The Petitioner currently lives in Little Falls with his wife and two sons, and he continues to own and operate a restaurant there called "The Great Wall."

In the fall of 1998, the Petitioner was contacted by a cousin who had recently moved from Hong Kong to Canada.  The cousin asked the Petitioner to help him start a restaurant business in Canada.  The Petitioner tried to go to Canada so as to visit his cousin, but he was turned away by Canadian immigration officials.[4]  On November 9,

---

[3]Before March of 2003, USCIS, which is the Federal agency responsible for naturalization matters, was known as the Immigration and Naturalization Service, or "INS."  We refer to that agency, in this Report, as "the Respondent," although there are a few references to the INS in our discussion of precedential case law.

[4]The Record provides very little information about this attempt to go to Canada. The Petitioner reports that he flew to a  city in Canada -- presumably to the City of Vancouver, as that is where the cousin purportedly was living -- but he was not

(continued...)

1998, the Petitioner tried, once again, to enter Canada, and this time he brought $24,000.00 in cash with him.  Once again, however, the Petitioner was barred from entering Canada, and he was sent back to the United States.  [R. 96-97].

According to the Respondent, the Petitioner violated both Canadian and U.S. laws by bringing  more than $10,000 across the American/Canadian border without filing a proper declaration.  However, there is nothing in the Record to suggest that the Petitioner was ever arrested, or charged, with any criminal offense, in either Canada or the United States, as a result of his assertedly unlawful attempt to bring cash across the border.

In 2001, the Petitioner applied to become a naturalized citizen of the United States.  [R. 73-82].  While processing the Petitioner's application for naturalization, Federal immigration authorities evidently discovered his unsuccessful attempts to enter Canada in 1998.  As a consequence, when the Petitioner was interviewed in connection

---

[4](...continued)
allowed to enter the country, because Canadian immigration officials were suspicious about the purpose of his visit.  They asked the Petitioner why he was coming to Canada, with little advance planning, for just a one-day visit.  When the Petitioner was unable to provide an address for the cousin he was planning to visit, and the immigration officials were unable to reach the cousin by telephone, the Petitioner was denied admission, and was sent back to the United States.  [R. 96-97].

with his naturalization application, on May 9, 2002, the interviewer asked him whether he had been to Canada.  [R. 76].  When the Petitioner answered "no," the interviewer next asked him whether he had "tried to go to Canada."  Once again, the Petitioner answered "no."   [R. 76].   These responses were under penalty of perjury, as acknowledged by the Petitioner's signature dated May 9. 2002.  [R.82].

Shortly after that interview, the Petitioner was informed that his request for naturalization was being granted, and that he should prepare for an upcoming naturalization ceremony.  However, the Petitioner was later told that he should not attend the ceremony because, the Respondent now claims, his application had been granted "inadvertently."   The Petitioner was then instructed to attend a second interview, which was conducted on August 23, 2002.

During the course of the Petitioner's second interview, he was asked whether he had "ever lied to a custom's official."  He answered "no."  He was then asked whether he had "ever been denied entry into Canada."  Again, he answered "no."  [R. 80].  Again, these responses were made under penalty of perjury, as acknowledged by the Petitioner's signature dated August 23, 2002.[5]  [R. 82].  At that point, the

---

[5]The Petitioner concedes that the statements he made during his naturalization
(continued...)

interviewer apparently disclosed that Federal immigration authorities were already aware of the instance when the Petitioner attempted to enter Canada with $24,000 in cash, and was turned away.  Only then did the Petitioner finally acknowledge that incident.

Following the second interview, the Petitioner was given a "Form N-14," which described the incident when he had attempted to bring $24,000 into Canada.  The form also directed him to "[f]urnish a written statement, stating why you failed to disclose this information during your first interview."  [R. 94-95].  On September 3, 2002, the Petitioner submitted a two-page letter, in which he discussed his unsuccessful attempts to enter Canada, as well as his testimony about those matters at his two naturalization interviews.  [R. 96-97].  The critical paragraph of that letter reads as follows:

> First of all, I need to clarify to Immigration Officer about the interview, when you asked if I have been to Canada. My answer was "No."  This is because I think that I used to try to go to Canada, but I never ever have chance to enter the border, so I think that does not count as visiting Canada.  Originally I wanted to answer that I tried to go to Canada, but failed to enter Canada border.  I am worried that Immigration Officer will ask me why, I know that I

---

[5](...continued)
interviews were made under oath.  See Petitioner's Memorandum of Law in Support of Petition for De Novo Review, Docket No. 11, at p. 20.

> don't speak fluent English, if I answer in this way, it's going
> to cause more doubts and problems, I am so worried that
> I can't answer in details.  So I only could answer I never
> been to Canada, I never have any intention to lie and I am
> so sorry about this."

[R. 96].

On November 6, 2002, the Respondent wrote a letter to the Petitioner, which

confirmed that his application for naturalization had previously been approved.  [R.

72].  The letter also confirmed, however, that the application had been "reopened"

because of "derogatory information" pertaining to the Canada-entry incidents.  The

Petitioner was given fifteen (15) days to attempt to "overcome the derogatory

information."  The Petitioner retained counsel to respond to the letter of November 6,

2002, and that response, [R. 87-93], was filed approximately two weeks later.

The Respondent was not satisfied with the Petitioner's attempt to explain his

testimony regarding the Canada-entry incidents.  By letter dated May 15, 2003, the

Respondent advised the Petitioner that his naturalization application was denied.  [R.

70-71].  The Respondent explained its denial as follows:

> On May 9, 2002, and August 23, 2002, you provided sworn
> testimony to an officer of this Service that you have never
> had problems with US Customs, never attempted to enter
> Canada and that you have never been denied entry into
> Canada, which precludes a finding of good moral character.
> In light of your false testimony the Service is unable to

> determine if you meet the requirement of good moral
> character.  You did not disclose the information regarding
> your incident in Canada until the Service brought the
> information to your attention.  Furthermore, due to your
> false testimony, the Service is unable to determine if any of
> your testimony is credible and establishes your eligibility for
> naturalization.

[R. 70].

After the Petitioner learned that his application for naturalization had been denied, he

filed a request for a Hearing on that decision.  [R. 37].

The Petitioner was interviewed, again, on August 5, 2003, but shortly thereafter,

the Respondent reaffirmed the denial of his application for naturalization.  In a three-

page letter, which is dated August 25, 2003, [R. 34-36], the Respondent provided the

following explanation:

> It is concluded that you provided false testimony under
> oath in connection with your application for the purpose of
> obtaining an immigration benefit.  This precludes a finding
> of good moral character for naturalization purposes.

[R. 35].

The Petitioner then retained his current counsel, and mounted two separate challenges

to the denial of his application for naturalization.  On December 11, 2003, he filed an

administrative appeal, [R. 7-33], and then, on December 19, 2003, he filed the Petition

For De Novo Review that is now before this Court.[6]  The Petitioner's administrative

appeal was denied on March 30, 2004, [R. 1-2], so it appears that he has now fully

exhausted all of his available administrative remedies.

III.  Discussion

A.    Service of Process.

As an initial matter, the Respondent has argued that the Petitioner's failure

to effect proper service requires that his Petition be dismissed, without any

consideration of its merits. When the Petitioner filed his current "Petition For De Novo

Review," he also mailed copies of the Petition to:   1) the District Director of the

Department of Homeland Security, United States Citizenship and Immigration

Services, in Bloomington, Minnesota, which is the office that had denied his

application for naturalization; 2) the Assistant Attorney General for Administration,

Justice Department Division, United States Department of Justice, in Washington,

---

[6]The Petitioner felt compelled to bring the present action before getting a ruling on his administrative appeal because, according to 8 C.F.R. § 336.9(b), a request for District Court review of a naturalization application must be filed within 120 days after "the Service's final determination."   The Petitioner evidently understood that the Respondent's letter of August 25, 2003, was the "final determination" that triggered the 120-day cutoff for seeking judicial review.   The Respondent has offered no argument to the contrary.

D.C.; and 3) the Attorney General of the United States, United States Department of.

Justice, in Washington, D.C.  <u>Affidavit of Service by Mail</u>, <u>Docket No. 1</u>.

The Respondent contends that the Petition was not properly served because:
(a) it was not accompanied by a Summons, as required by Rule 4(c)(1), Federal Rules
of Civil Procedure; and (b) it was not served in the manner prescribed by Rule 4(i),
Federal Rules of Civil Procedure.  As noted, the Respondent urges that this action be
summarily dismissed because of those alleged deficiencies in service.

As the Petitioner correctly notes, however, 8 C.F.R. §336.9 seems to provide
that requests for judicial review of naturalization decisions <u>not</u> be brought by filing a
common civil Complaint in accordance with Rules 7 through 11, Federal Rules of Civil
Procedure.  Instead, it appears that filing a "petition for review," in accordance with
8 C.F.R. §336.9(b), may be the "sole and exclusive" procedure for bringing such a
request.[7]

---

[7]Title 8 C.F.R. §336.9(a) and (b) provide as follows:

> a)      General. The provisions in part 310 of this chapter
> shall provide the sole and exclusive procedures for
> requesting judicial review of final determinations on
> applications for naturalization made pursuant to section
> 336(a) of the Act and the provisions of this chapter by the
>
> (continued...)

8 C.F.R. §336.9(b) makes no reference to a "summons," to "service of process," or to Rule 4, Federal Rules of Civil Procedure.  Therefore, contrary to the Respondent's argument, it is by no means clear that the Petitioner was required to serve a Summons and Complaint, on the Respondent, in the manner prescribed by Rule 4(i), Federal Rules of Civil Procedure.[8]  It appears equally plausible that, pursuant to the authority of 8 C.F.R. §336.9(b), the Petitioner could properly bring his

_____

[7](...continued)
> Service on or after October 1, 1991.
>
> (b)    Filing a petition. Under these procedures an applicant shall file a petition for review in the United States District Court having jurisdiction over his or her place of residence, in accordance with chapter 7 of title 5, United States Code, within a period of not more than 120 days after the Service's final determination.  The petition for review shall be brought against the Immigration and Naturalization Service, and service of the petition for review shall be made upon the Attorney General of the United States, and upon the official in charge of the Service office where the hearing was held pursuant to §336.2.

[8]Although the Respondent has cited no case law in support of its defective service argument, the Court notes that a similar argument was apparently raised, and accepted, in another case filed in this District.  Siariya v. Immigration and Naturalization Service, Civil No. 02-583 (DSD/SRN), aff'd, 53 Fed.Appx. 399 (8th Cir. 2002)[unpublished opinion].  Siariya provides no meaningful guidance here, however, as neither the District Court, nor the Court of Appeals, explained how the argument was analyzed and resolved.

- 11 -

application for judicial review by filing his Petition for review with the Court, and then mailing a copy of it to the "Service office" where his Naturalization Hearing was held -- which is exactly what the Petitioner did here.

Furthermore, the fundamental purpose of Rule 4, Federal Rules of Civil Procedure, is simply to ensure that responding parties are notified of actions brought against them, and that purpose has been satisfied here. Quite plainly, the Respondent is fully aware of the Petitioner's current action, and the Respondent does not claim to have been prejudiced, or disadvantaged in any way, as a result of the notification process that was employed in this case. Moreover, even if we were to find that the Respondent had not been properly served, we would not be inclined to dismiss the action, but instead, we would afford the Petitioner an opportunity to effect proper service, which would generate nothing but further delay in the ultimate resolution of this matter -- a result that would not advance the best interests of either party.

We are aware of only one other Federal Court that has had to address the service of process issue, which has been raised by the Respondent here. See, Tan v. United States Department of Justice, INS, 931 F. Supp. 725 (D. Hawaii 1996). There, the District Court noted that the respondent "was given notice and time to respond," and there was no indication of any "prejudice as a result of any allegedly defective

- 12 -

service."   Id. at 726, n. 1.  As a result, the Court, in Tan, elected to "overlook any

technical defects in service," and reach the merits of the Petition for judicial review.

Id.  We find that to be the most reasonable approach, here, and therefore, we proceed

to the merits of the Petition.

      B.    The Parties' Cross-Motions for Summary Judgment.[9]

      1.    Standard of Review.  The Petitioner brought this action under Title

8 U.S.C. §1421(c), which provides as follows:

> A person whose application for naturalization under this
> subchapter is denied, after a hearing before an immigration
> officer under section 1447(a) of this Title, may seek review
> of such denial before the United States district court for the
> district in which such person resides in accordance with
> chapter 7 of Title 5.  Such review shall be de novo, and the
> court shall make its own findings of fact and conclusions of
> law and shall, at the request of the petitioner, conduct a
> hearing de novo on the application.

Section 1421(c) is complemented by 8 C.F.R. §§310.5(b) and 336.9(c), which,

respectively, state as follows:

> After denial of an application. After an application for
> naturalization is denied following a hearing before a Service

---

[9]This section of our Report contains our conclusions of law, and our mixed
determinations of fact and law, insofar as they relate to the Respondent's denial of
naturalization to the Petitioner.

- 13 -

> officer pursuant to section 336(a) of the Act, the applicant
> may seek judicial review of the decision pursuant to section
> 310 of the Act.

8 C.F.R. §310.5(b).

*   *   *

> Standard of review. The review will be de novo, and the
> court will make its own findings of fact and conclusions of
> law. The court may also conduct, at the request of the
> petitioner, a hearing de novo on the application for
> naturalization.

8 C.F.R. § 336.9(c).

Here, the Petitioner has not requested a Hearing de novo.  Rather, by letter dated November 16, 2004, counsel for the Petitioner advised the Court that "oral argument on the pending cross-motions for summary judgment/dismissal has been waived by both the Petitioner and the Respondent." and "[t]he parties agree to submit these motions on the written materials."  Docket No. 19.  Therefore, we decide the issues on the basis of the Administrative Record, and related papers that the parties have drawn to our attention, recognizing that the Petitioner bears the burden of proving, by a preponderance of the evidence, that he meets all of the requirements for naturalization.  See 8 C.F.R. §316.2(b).

2.   Legal Analysis.  The basic requirements for naturalization are found in Title 8 U.S.C. §1427(a):

- 14 -

No person, except as otherwise provided in this subchapter, shall be naturalized unless such applicant, (1) immediately preceding the date of filing his application for naturalization has resided continuously, after being lawfully admitted for permanent residence, within the United States for at least five years and during the five years immediately preceding the date of filing his application has been physically present therein for periods totaling at least half of that time, and who has resided within the State or within the district of the Service in the United States in which the applicant filed the application for at least three months, (2) has resided continuously within the United States from the date of the application up to the time of admission to citizenship, and (3) **during all the periods referred to in this subsection has been and still is a person of good moral character**, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the United States.

[Emphasis added].

The critical issue presented, here, is whether the Petitioner meets the "good moral character" requirement we have highlighted above. The requirement is described in greater detail, by Title 8 U.S.C. §1101(f), as follows:

For the purposes of this chapter--

No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was–

\*   \*   \*

- 15 -

(6)    one who has given false testimony for the purpose of obtaining any benefits under this chapter * * *.

Section 1101(f) is complemented by 8 C.F.R. §316.10 which, in relevant part, provides as follows:

(a)    Requirement of good moral character during the statutory period.

(1)    An applicant for naturalization bears the burden of demonstrating that, during the statutorily prescribed period, he or she has been and continues to be a person of good moral character.  This includes the period between the examination and the administration of the oath of allegiance.

(2)    In accordance with section 101(f) of the Act, the Service shall evaluate claims of good moral character on a case-by-case basis taking into account the elements enumerated in this section and the standards of the average citizen in the community of residence.  The Service is not limited to reviewing the applicant's conduct during the five years immediately preceding the filing of the application, but may take into consideration, as a basis for its determination, the applicant's conduct and acts at any time prior to that period, if the conduct of the applicant during the statutory period does not reflect that there has been reform of character from an earlier period or if the earlier conduct and acts appear

- 16 -

relevant to a determination of the applicant's present moral character.

(b)    Finding of a lack of good moral character.

*    *    *

(2)    An applicant shall be found to lack good moral character if during the statutory period the applicant:

*    *    *

(vi) **Has given false testimony to obtain any benefit from the Act**, if the testimony was made under oath or affirmation and with an intent to obtain an immigration benefit; **this prohibition applies regardless of whether the information provided in the false testimony was material**, in the sense that if given truthfully it would have rendered ineligible for benefits either the applicant or the person on whose behalf the applicant sought the benefit * * *.

[Emphasis added].

As the Regulations clearly prescribe, an applicant for naturalization has the burden of proving that he or she satisfies all of the requirements for citizenship. See, <u>Berenyi v.</u>

- 17 -

District Director, 385 U.S. 630, 636-37 (1967)("[W]hen an alien seeks to obtain the privileges and benefits of citizenship * * * the burden is on the alien applicant to show his eligibility for citizenship in every respect").

The statutory naturalization requirements are strictly construed and enforced. Fedorenko v. United States, 449 U.S. 490, 506 (1981)("[T]here must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship"). Any doubts as to whether those requirements have been met are to be resolved against the applicant. Berenyi v. District Director, supra at 637; see also, United States v. Macintosh, 283 U.S. 605, 626 (1931)("The Naturalization Act is to be construed 'with definite purpose to favor and support the government,' and the United States is entitled to the benefit of any doubt which remains in the mind of the court as to any essential matter of fact.").

Here, the Respondent has determined that the Petitioner failed to meet all of the requirements for naturalization, because he did not satisfy the "good moral character" standard that is established by Title 8 U.S.C. §1427(a). Relying on Title 8 U.S.C. §1101(f)(6), the Respondent has concluded that the Petitioner could not be regarded as "a person of good moral character," for naturalization purposes, because he gave "false testimony for the purpose of obtaining" naturalization. We agree.

Both parties appear to recognize, at least implicitly, that the Respondent's reliance on Section 1101(f)(6) gives rise to two separate issues. First, did the Petitioner give false testimony? And second, if the Petitioner gave false testimony, was that testimony given "for the purpose of obtaining any benefits" under the naturalization statute? We address each issue in turn.

a.  <u>False Testimony</u>.   The Respondent contends that the Petitioner made false statements, under oath, during the naturalization interviews that were conducted on May 9, 2002, and August 23, 2002. The Record substantiates that contention. During the first interview, the Petitioner denied that he had been to Canada, or that he had ever "tried to go to Canada." [R. 76]. During the second interview, the Petitioner testified that he had never been denied entry into Canada. [R. 80]. The Petitioner's testimony was plainly false, and we find, by a preponderance of the evidence, that the Petitioner knew the testimony was false when he made those statements under oath.

The Petitioner contends that he did not answer the interviewers' questions accurately because he was unsure what they meant when they asked him about "entering" Canada. <u>Petitioner's Memorandum of Law In Support Of Motion For Summary Judgment</u>, at p. 10, <u>Docket No. 11</u>. He argues that the words "enter" and

"entry" are ambiguous when used in the context of international travel, especially for a person who is not a native English speaker.  If the Petitioner had been asked only whether he had "entered" Canada, we would be much more sympathetic to his argument.  Indeed, even now it is not entirely clear whether the Petitioner did "enter" Canada, once he physically crossed the border, or whether he did not enter Canada, because he was barred from admission by the Canadian border officials, and was returned to the United States.  However, the Respondent contends -- without contradiction -- that the Petitioner was asked not simply whether he entered Canada, but whether he had ever tried to enter Canada.  There is no reason to believe that the Petitioner did not understand the meaning of the question about whether he ever tried to enter Canada.  Nor is there any reason to believe that the Petitioner failed to understand the equally straightforward inquiry about whether he had ever been denied entry into Canada.  Notably, the Petitioner's false responses were provided during two separate interviews that were conducted months apart.

Furthermore, the Petitioner later admitted that he knew that he had tried to enter Canada, and he knew that he had been denied entry.  In his letter of September 3, 2002, the Petitioner stated, "[o]riginally I wanted to answer that I tried to go to Canada, but failed to enter Canada border." [R. 96].  The Petitioner's letter clearly

shows that he gave false answers to the interviewers' questions, not because he failed to understand the questions, but because he was, assertedly, concerned about his ability to fully explain the true story.  Regardless of whether that concern was justified, the fact remains that the Petitioner knew he was providing false testimony. Accordingly, we reject the Petitioner's assertion, that he provided false answers to the interviewers' questions, because he did not accurately understand them.

The Petitioner also maintains that there was nothing nefarious about his two ill-fated trips to Canada in 1998, and he has proffered the Affidavit of his cousin, to whom he had intended to meet in Canada.  See Affidavit of Lin Rui Qing, attached as Exhibit A to Affidavit of Michael J. Ford, dated November 8, 2004.   What the Petitioner seems to be arguing is that the Canadian incidents were wholly innocent, and accordingly, that they cannot be material to the good moral character issue which now confronts the Court.  We find, however, that the actual propriety or impropriety of the Petitioner's attempts to visit Canada has no direct bearing on the outcome of this matter.

In Kungys v. United States, 485 U.S. 759 (1988), the Supreme Court considered whether a false statement had to be "material" to the merits of an alien's

naturalization application in order to show a lack of moral character.   The Court

resolved the issue as follows:

> Under 8 U.S.C. §1101(f)(6), a person shall be deemed not
> to be of good moral character if he "has given false
> testimony for the purpose of obtaining" immigration or
> naturalization benefits.   On its face, §1101(f)(6) does not
> distinguish between material and immaterial
> misrepresentations.   Literally read, it denominates a person
> to be of bad moral character on account of having given
> false testimony if he has told even the most immaterial of
> lies with the subjective intent of obtaining immigration or
> naturalization benefits.   We think it means precisely what it
> says.

Id. at 779-80.

As a result, it is of no consequence that the Petitioner's attempt to enter Canada, in

and of itself, may have been entirely legal, or even altruistic, insofar as he may have

been trying to help a relative in a time of need.   According to Kungys, a naturalization

applicant cannot be regarded as "a person of good moral character" "if he has told

even the most immaterial of lies with the subjective intent of obtaining immigration or

naturalization benefits."   Id.

Therefore, we conclude that the Petitioner did provide false testimony to an

immigration officer when he stated, on May 9, 2002, that he had not tried to enter

Canada, and when he stated, on August 23, 2002, that he had never been denied

admission to Canada.   The circumstances surrounding the Petitioner's attempts to enter Canada do not appear to have any **direct** bearing on the "good moral character" issue.   Rather, under Section 1101(f)(6), the Petitioner's false statements concerning those incidents will preclude him from being regarded as a person of good moral character, **if** those statements were made "for the purpose of obtaining" immigration or naturalization benefits.   Accordingly, we proceed to the second question.

        b.    <u>The Purpose of the Petitioner's False Testimony</u>.   The dispositive issue before us devolves to whether the Petitioner's false testimony, regarding his attempts to visit Canada, was given for the purpose of obtaining the benefits of naturalization.   In other words, did the Petitioner testify falsely in order to improve his chances of gaining naturalization, or did he have some other motivation, intention, or purpose?

    In <u>Kungys</u>, the Court confirmed that "[Section] 1101(f)(6) applies to only those misrepresentations made with the subjective intent of obtaining immigration benefits." <u>Kungys v. United States</u>, supra at 780.   The Court also repeated the Government's acknowledgment that "[i]t is only dishonesty accompanied by this precise intent that Congress found morally unacceptable," and "[w]illful misrepresentations made for other reasons, such as embarrassment, fear, or a desire for privacy, were not deemed

- 23 -

sufficiently culpable to brand the applicant as someone who lacks good moral character."  Id., quoting the Supplemental Brief for the United States [at] 12.

Citing this language from Kungys, the Petitioner claims that, even if he did give false testimony during his naturalization interviews, he should, nonetheless, be found to be a person of good moral character, under Section 1101(f)(6), because he did not intend to deceive the Respondent but, rather, he was just too embarrassed to tell the truth.  In the words of Petitioner's counsel:

> He was embarrassed and confused by the questions relating to his attempts to enter Canada four years earlier. Moreover, he regarded those trips as personal and private matters * * *.  Any allegedly false statements were made as a result of his fear, embarrassment or his desire for privacy.

Petitioner's Memorandum of Law In Support Of Motion For Summary Judgment, Docket No. 11, at pp. 11 and 21.

Often it is difficult to discern the subjective intent that motivates a person's words or actions.  Here, however, the Petitioner's own statements undermine his claims of embarrassment, confusion, or his expectation of privacy.  In his letter dated September 3, 2002, he stated that he provided false testimony during his naturalization interviews, because he was afraid that telling the truth would "cause more doubts and problems."  [R. 96].  The explanation clearly reveals that what concerned the

Petitioner, when he falsely told the interviewers that he had not tried to go to Canada, and that he had not been denied admission to Canada, was concern that true answers would complicate, if not wholly impede, his claim to naturalization.  As the Petitioner explained, he believed that, if he told the truth, it could jeopardize his application for naturalization.  Indeed, the Petitioner has candidly admitted that he was "fearful that [the Respondent] would rely on these incidents to deny his application for naturalization."  <u>Petitioner's Memorandum of Law In Support Of Motion For Summary Judgment</u>, at p. 15  Simply put, the Petitioner testified falsely for the purpose of improving his prospects for naturalization.

The Petitioner may have felt some embarrassment about the Canadian incidents, and he may have been somewhat confused about why they occurred, or how they were relevant to his application for naturalization.  We find, however, based upon a preponderance of the credible and competent evidence, that those factors were not the critical motivation for his false testimony.  The Petitioner's subsequent statements, most notably in his letter of September 3, 2002, reveal that he provided false testimony to the naturalization interviewers because he thought it would improve his chances for gaining naturalization if the interviewers did not know about the Canadian incidents. In sum, we find and conclude that the Petitioner gave false testimony for the purpose

of obtaining naturalization; and that puts him squarely within Section 1101(f)(6)'s definition of person who shall not be regarded as "a person of good moral character" for naturalization purposes.

We have considered the cases cited by the Petitioner, including Plewa v. INS, 77 F. Supp.2d 905 (N.D. Ill. 1999), Klig v. United States, 296 F.2d 343 (2nd Cir. 1961), Chan v. INS, No. 00 MISC 243(FB) (E.D. N.Y., May 11, 2001), 2001 WL 521706, Saad v. Barrows, No. CIV.A. 3:03-CV-1342G (N.D. Tex., June 16, 2004), 2004 WL 1359165, DeLuca v. Ashcroft, 203 F. Supp.2d 1276 (M.D. Ala. 2002), Poka v. INS, No. Civ.A. 3:01CV1378 (CFD)(D. Conn., September 19, 2002), 2002 WL 31121382, and Jalloh v. INS, No. 02-cv-1254 (D. Minn., September 15, 2003), 2003 WL 22145308 (Davis, J.).   However, we find each of the cases to be factually distinguishable from the circumstances presented here.   In virtually all of those cases, the Courts specifically found that the applicant for naturalization had not intentionally provided false testimony, but instead, had been confused by legal terminology, a language barrier, bad advise from an advocate, or by some combination of the same. See e.g., Poka v. INS, supra at *4 ("The Court credits [the applicant's] testimony that he was not trying to mislead the INS, but rather, was confused about what the terms 'arrested' and 'convicted' signified."); Saad v. Barrows, supra at *8 (finding that

applicant "honestly believed he was making accurate and truthful statements"); Chan v. INS, supra at *7 (finding that applicant's erroneous statements under oath "were not misrepresentations aimed to deceive the INS; rather they appear to be the consequences of [the applicant's] confusion, misunderstandings, limited command of English, and lack of a full appreciation of the factors that would constitute and render impregnable his arrest under the American legal system").

In Klig v. United States, supra, the Court of Appeals for the Second Circuit concluded that the naturalization applicant's false statements should not automatically preclude him from becoming a citizen because the false statements, which were there at issue, did not pertain to matters that directly affected the applicant's eligibility for citizenship. Such reasoning, however, was later rejected in Kungys, where the Supreme Court held that "even the most immaterial of lies" will bar naturalization, if told "with the subjective intent of obtaining immigration or naturalization benefits." Kungys v. United States, supra at 780.

The Jalloh case has little relevance to this one because, there, the issue was whether an application for naturalization should be denied based on the applicant's criminal record, rather than because of any false testimony. In Plewa, the case on which the Petitioner seems to rely most heavily, an "immigration counselor" assisted

an alien who was applying for naturalization.  The counselor erroneously advised the applicant that she need not disclose a past arrest to the INS.  However, the INS found that she was barred from naturalization, because she failed to disclose that arrest.  The District Court later determined that the applicant had candidly disclosed the arrest to the immigration counselor, that she had reasonably relied on the counselor's advice, -- i.e., that the arrest need not be disclosed to the INS -- and that she did not try to hide anything about the arrest from either the counselor or the INS.  The District Court concluded that, "[l]ooking at the totality of the circumstances, Plaintiff had no subjective intent to deceive INS to obtain citizenship status when she gave her false testimony based on [the counselor's] erroneous advice."  Plewa v. INS, supra at 913.

We find that the facts, here, to be distinguishable from those in Plewa, and the other cases cited by the Petitioner, because:  (a) the Petitioner has acknowledged that he knew he was not telling the whole truth when he testified that he had not tried to go to Canada, and that he had not been denied admission to Canada; and (b) the Petitioner has acknowledged that the reason that he did not tell the whole truth was to avoid potential "doubts and problems" with regard to his application for naturalization.

We conclude that the circumstances, which are presented here, are closely akin to those presented in Del Guercio v. Pupko, 160 F.2d 799 (9th Cir. 1947), and In re

Haniatakis, 376 F.2d 728 (3rd Cir. 1967).  In Del Guercio, a naturalization applicant told

an interviewer that she had not been arrested when, in fact, she had previously been

arrested on "a morals charge."  It was only after the applicant was confronted with

proof of her arrest that she finally acknowledged her false testimony to the interviewer.

The applicant then explained that "she had determined not to reveal the [arrest]

incident in the feeling that should she do so her application would immediately be

denied, whereas if she made no disclosure the fact would be found out by the

immigration people and she would then have a chance to explain it."  Del Guercio v.

Pupko, supra at 799.  The District Court concluded that the applicant's arrest incident

"did not reflect adversely on her moral character," and granted her application for

naturalization.

On appeal, the Court of Appeals for the Ninth Circuit agreed that the applicant

should not be barred from naturalization because of the arrest incident itself.

However, the Court pointed out that "the giving of false information to the Service is

another matter, and on this phase we think the [district] court fell into error."  Id. at

800.  In describing that error, the Court stated:

> Appellee's grave fault lay in her falsification of a matter
> concerning which the government was obviously entitled to
> be informed.  Her professed purpose was, not to make a

> disclosure of the incident at some later and supposedly more opportune stage, but merely to attempt an explanation in the event the Service should chance to stumble upon the truth. There is nothing unique in such a motive; doubtless much the same idea animates every aspirant for citizenship who gives an untruthful answer to a material inquiry. Should the courts condone these deceitful practices the whole procedure preliminary to naturalization would be effectively undermined and the declared purpose of Congress frustrated.

Id.

Since the applicant testified falsely to facilitate her naturalization, the Court of Appeals reversed the District Court's previous Order which granted naturalization.  Id.

In Haniatakis, an applicant for naturalization gave the INS false information about her marital status and residence.  When the INS confronted her with the truth, the applicant explained that "she had concealed her marriage out of fear that her naturalization would be held up for five more years if the fact of her marriage to another alien had been revealed."  In re Haniatakis, supra at 729.  The District Court apparently accepted this explanation and ordered that the applicant be granted naturalization, but that Order was reversed on appeal.

The Court of Appeals for the Third Circuit noted that the applicant's "explanation makes her conduct all the more tragic, for the Immigration and Naturalization Service declares that her marriage to another alien would not have

affected her application." Id.  Although the applicant's marital history, by itself, would not have made her ineligible for naturalization, her false testimony about the matter was found to be "conclusive proof of lack of good moral character." Id. at 730; see also, Berenyi v. District Director, supra at 638 ("[T]he petitioner's application [for naturalization] was not denied because of his Communist Party membership," but "because, under oath, he did not tell the truth.")  The Court of Appeals further noted that "[t]he statute is not concerned with the significance or materiality of a particular question, but rather, * * * intends that naturalization should be denied to one who gives false testimony to facilitate naturalization." Id.[10]  The Court concluded that the

---

[10]The Haniatakis Court further explained as follows:

> The reason for denying naturalization whenever false testimony is given in an attempt to gain it goes beyond a judgment that one who gives false testimony to deceive the government is by that fact unworthy of the privileges of citizenship; it is also based on the practical ground that a false answer to a query which on its face appears innocuous may effectively cut off a line of inquiry which might have revealed further facts bearing on the petitioner's eligibility for citizenship.  Having asked a question which it deems significant to determine the qualifications of one seeking citizenship, the government is entitled to full disclosure.

In re Haniatakis, supra at 730, citing Berenyi v. District Director, 385 U.S. 630, 638 (1967).

applicant had given false testimony because she thought it would ease her passage to naturalization and, by law, her false testimony precluded her from gaining naturalization.

The Petitioner claims that he had no subjective intent to mislead the Respondent by his testimony about the Canadian incidents, but his own words show otherwise. He has candidly acknowledged that he did provide false testimony about those incidents, and that he did so because he was afraid that, if he told the truth, his application for naturalization would be hindered by "more doubts and problems." Accordingly, we find and conclude that the Petitioner deliberately gave false testimony to improve his prospects for naturalization.  It follows, pursuant to Section 1101(f)(6), that he cannot be regarded as a person of good moral character, and that his application for naturalization cannot be granted at this time.

In reaching this conclusion, we have considered the entire Record, including the nine (9) Affidavits that are attached to the Petition for Review, and that were offered in support of the Petitioner's application for naturalization.  [R. 24-33].  Considering the Record as a whole, including those Affidavits, we find that the Petitioner may very well be a person of good moral character under a layperson's understanding of that expression.  Unfortunately for the Petitioner, however, his application for naturalization

is subject to the statutory definition enacted by Congress, and he cannot be considered a person of good moral character when he has provided false testimony for the purpose of securing the benefits of naturalization.

Lastly, the Respondent notes that the Petitioner's "false testimony bars a finding of good moral character," under the statute, for only five years,[11] and that the Petitioner "may be eligible to apply for naturalization [again] after August 23, 2007." [R. 35].  We interpret the Respondent's comment as a suggestion that the Petitioner reapply for naturalization after the present five-year statutory bar expires, and we concur in that suggestion.[12]  Of course, we suggest no view as to whether such an application should be granted, but it is plain from the Affidavits, which the Petitioner has provided for our review, that he holds the respect, affection, and good will, of those who know him on a day-to-day basis, and such regard by community members would appear to bode well for him in any re-application effort.

---

[11]See Title 8 U.S.C. §1427(a), quoted at pp. 15-16, supra.

[12]See DeLuca v. Ashcroft, 203 F. Supp.2d 1276, 1281 (M.D. Ala. 2002)("The Court in no way intends this opinion to be a future bar to Mrs. DeLuca's naturalization," as "the Court believes that she would be an excellent candidate for naturalization upon her re-application after the expiration of the statutory period.").

We see nothing in this Record to suggest that the Petitioner is a "bad" person; at worst, he appears to have made a bad judgment call which, under directive of Congress, renders him ineligible for naturalization at this time.  Congress has mandated that applicants for naturalization must attest only to the truth and, if we fail to effectuate that command, the application process will have no effective means to  assure that naturalization applications are, in all things, truthful.

NOW, THEREFORE, It is –

RECOMMENDED:

1.     That the Petitioner's Motion For Summary Judgment [Docket No. 10] be denied.

2.     That the Respondent's Motion To Dismiss, or for Summary Judgment [Docket No. 13], be granted.

3.     That Judgment be entered for the Respondent.

Dated:  June 1, 2005                    s/Raymond L. Erickson

                                        Raymond L. Erickson
                                        UNITED STATES MAGISTRATE JUDGE

**N O T I C E**

- 34 -

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than _June 17, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than June 17, 2005**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.